## IN RE TORMES, QUERELLADO.

### Procedimiento de *disbarment*.

No. 14.—Resuelto en julio 10, 1922.

ABOGADO—SUSPENSIÓN DE UN ABOGADO EN EL EJERCICIO DE SU PROFESIÓN—*Disbarment.*—En la opinión se analizan los cargos formulados y la prueba aportada y se concluye que hay base suficiente por lo menos para suspender al querellado en el ejercicio de su profesión de abogado por un período de dos años.

Los hechos están expresados en la opinión.

Abogados del querellado: *Sres. J. H. Brown, R. Martínez Nadal y D. Sepúlveda.*

Abogados del querellante: *Sres. J. E. Figueras y A. Font, Fiscales.*

EL JUEZ PRESIDENTE SR. DEL TORO, emitió la opinión del tribunal.

El 10 de febrero de 1922 el fiscal de esta corte, por dele-

gación del Attorney General de Puerto Rico, archivó una querella solicitando la separación del abogado Leopoldo Tormes del ejercicio de su profesión. Suscitó el querellado varias cuestiones de derecho. Se oyó a ambas partes y el tribunal, por resolución de 24 de marzo último declaró sin lugar la moción eliminatoria y con lugar la excepción previa en cuanto a los dos primeros cargos, concediendo un plazo al fiscal para enmendar la querella. Véase *In re Tormes,* 30 D. P. R. 267. La querella fué, en efecto, enmendada, y la vista del caso se celebró en los días 2, 3 y 4 de mayo de 1922. La transcripción de las notas taquigráficas quedó terminada el 26 del propio mes de mayo y así el asunto definitivamente sometido a la consideración y resolución del tribunal.

1. La querella contiene tres cargos. El primero dice así:

"Que allá por el mes de abril de 1921 el abogado-notario Leopoldo Tormes García solicitó del señor Miguel Almodóvar, de Ponce, le facilitara la cantidad de tres mil dollars bajo las falsas y fraudulentas simulaciones de que, aunque tenía esa misma suma a su nombre y en cuenta corriente en el banco 'Crédito y Ahorro Ponceño,' no obstante no le convenía retirarla personalmente del referido banco, induciendo de este modo al referido señor Almodóvar para que le facilitara la expresada suma de tres mil dollars a cambio de un cheque que por igual suma le daría el abogado Tormes contra el banco 'Crédito y Ahorro Ponceño' ·para que de su cuenta corriente extrajese la expresada cantidad de tres mil dollars.

"Que el citado· Leopoldo Tormes García en su bufete hizo entrega al señor Almodóvar de un cheque a su favor concebido en los siguientes términos:

" 'Ponce, Puerto Rico, Abril 9 de 1921, No. 382.—El Crédito y Ahorro Ponceño, Ponce, P. R., pagará a la orden de Don Miguel Almodóvar Tres Mil Dollars. Son $3,000.00. (Firmado) Leopoldo Tormes.'

"Que creyendo el citado Almodóvar en las manifestaciones y simulaciones del abogado Leopoldo Tormes, acto seguido, en unión del referido Tormes, fueron al Banco de Ponce, en donde el señor Almodóvar extrajo de su cuenta de ahorros la cantidad de tres mil dollars, que entregó al expresado abogado Leopoldo Tormes.

"Que posteriormente, en abril 12 de 1921, el señor Almodóvar entregó el cheque que le fué dado por el Lcdo. Tormes y de que se ha hecho mención anteriormente, contra el 'Crédito y Ahorro Ponceño,' al Banco de Ponce para que éste lo abonara en su cuenta de ahorros, y dicho Banco de Ponce envió el cheque al cobro al 'Crédito y Ahorro Ponceño,' siendo devuelto por éste manifestando no. tener fondos suficientes el citado señor Tormes.

"Alega asimismo el fiscal que los hechos relatados y realizados por el querellado lo fueron con la intención de engañar y defraudar al citado Miguel Almodóvar en la referida cantidad de tres mil dollars, y que el querellado sabía y le constaba que a la fecha de la expedición del expresado cheque no tenía la cantidad de tres mil dollars para cubrir el mismo en su cuenta corriente del 'Crédito y Ahorro Ponceño,' y en ninguna otra fecha tuvo una cantidad semejante en dicho banco; y que el expresado Miguel Almodóvar se desprendió de dicha suma de tres mil dollars a virtud de las falsas y fraudulentas simulaciones del querellado.

"Que el Banco de Ponce protestó dicho cheque por medio del abogado notario Eduardo Flores Colón.

"Que dicho cheque fué últimamente entregado al señor Almodóvar, quien requirió en varias ocasiones el Lcdo. Tormes para que le entregara el montante del referido cheque, ascendente a tres mil dollars, siendo infructuosas todas las gestiones practicadas para el cobro de la referida suma."

El querellado contestó:

"Que en abril 9 de 1921, el querellado tomó a préstamo sin interés, (y para ser devueltos oportunamente) a Miguel Almodóvar, la suma de tres mil dollars que recibió el mismo de manos de Almodóvar, en el Banco de Ponce, cuyas oficinas quedaban por dicha fecha, casi en frente del Crédito y Ahorro Ponceño; que el querellado entregó a Miguel Almodóvar, en dicha fecha un *check* por igual suma, con la condición de que presentara dicho *check* para su cobro en dicho Banco Crédito y Ahorro Ponceño, cuando el querellado así se lo avisara, pues dicho Almodóvar sabía, porque así se lo hizo saber el querellado al tiempo de la transacción, que el mismo no tenía en dicha fecha dicho importe disponible en su cuenta corriente en el banco girado Crédito y Ahorro Ponceño. Continúa alegando el querellado, que él mismo, al expedir dicho *check* tenía fundamentos para creer que el Banco Crédito y Ahorro Ponceño, lo honraría pagándolo,

aún cuando tales fondos no hubieran estado depositados en su cuenta corriente en dicho banco, alegando asimismo, que en dicho banco el querellado, ha tenido depósitos en su cuenta corriente por más de cuatro mil dollars, y crédito a cortos plazos por más de doce mil dollars. Continúa alegando el querellado, que sabiendo Miguel Almodóvar, que era un préstamo lo que había hecho al mismo por dichos tres mil dollars, así lo ha reconocido pública y privadamente, y que lo que el mismo quería era una garantía de su dinero, como así se le dió, y además, dentro de la base del contrato de garantía establecido sobre dicha suma, se le pagó a dicho Almodóvar el importe de un mil dollars a que se comprometió el querellado en 30 de enero de 1922, y ha pagado los intereses correspondientes de dicha suma, hasta esta fecha conforme se convino por la escritura de fecha 30 de octubre de 1921, otorgada ante el notario de Ponce, M. Alberto Salicrup.''

La prueba practicada es extensa. Miguel Almodóvar declaró como testigo. Formaba parte de una sucesión que poseía tierras en Santa Isabel. La sucesión tuvo un pleito en relación con el arrendamiento de dichas tierras a una Central y Tormes fué su abogado. El pleito se falló en contra de la sucesión y ésta finalmente vendió las tierras, correspondiendo a Almodóvar varios miles de dólares que tenía depositados en el Banco de Ponce. Almodóvar continuó visitando el bufete de su abogado, practicando en él maquinilla. El 9 de abril de 1921, hallándose en el bufete, Tormes lo llamó a su casa particular y le dijo:

"Que necesitaba hacer una operación ese día y que necesitaba que le cambiara un cheque por tres mil dólares porque él no quería retirar esa suma directamente del Crédito y Ahorro Ponceño. Que en eso no se perjudicaría en nada. Yo al principio me negué, pero después creyendo no perjudicarme se lo cambié, o sea, busqué la libreta de ahorros, fuimos al Banco de Ponce y retiré los tres mil dólares y se los entregué a Tormes."

El testigo fué sujeto a un largo contra-interrogatorio por los abogados del querellado y siempre sostuvo que los hechos

habían ocurrido en la forma indicada. Parece conveniente transcribir la parte que sigue de dicho contra-interrogatorio:

"P.—Dígame testigo, es cierto que usted habló en Ponce con el querellado Sr. Tormes la semana pasada? El sábado? R.—Yo me acuerdo que él fué a la tienda un día de esta semana. P.—Es o no cierto que él le fué a suplicar que viniera a decir la verdad? R.—Eso lo sabía yo. P.—Es cierto que entonces usted le dijo a él que era cierto que él le había dicho a usted que él no tenía fondos bastantes en el banco y que por eso necesitaba que usted le hiciera ese favor de que no fuera a cambiar el cheque hasta el martes o miércoles? R.—Eso me dijo él que dijera yo. P.—Usted conoce a Luciano Colón? R.—Luciano Colón? * * * Sí, señor. P.—El 3 de octubre del año pasado hablando con Luciano Colón usted no le dijo esas mismas manifestaciones? R.—No, señor. P.—Usted no ha hablado hoy mismo con la Sra. Tormes? R.—Sí, señor. P.—Usted no le ha repetido eso mismo a la Sra. Tormes? R.—Eso me ha dicho ella que yo diga."

La prueba demuestra que cuando el cheque de Tormes fué protestado, Almodóvar gestionó insistentemente cerca de Tormes la devolución de los tres mil dólares sin resultado alguno. Al fin Almodóvar el 23 de junio de 1921, se dirigió al Attorney General y le denunció los hechos. Después, en octubre de 1921, Tormes garantizó a Almodóvar el pago de la suma por medio de una hipoteca. A la fecha del juicio, Almodóvar había recibido mil dólares a cuenta de los tres mil, y estaba percibiendo intereses por los dos mil restantes.

La teoría de la defensa es que se trataba de un simple préstamo que Tormes no pudo pagar a su debido tiempo y se pone mucho énfasis en las manifestaciones de Almodóvar contenidas en las escrituras de hipoteca y de cancelación parcial. En efecto en dichas escrituras aparece Almodóvar aceptando que se trataba de un préstamo. Declarando como testigo, bajo juramento, Almodóvar insistió en que no era cierto lo del préstamo y que si firmó las escrituras lo hizo por recomendación del notario Sr. Chardón que le aseguró que no le

perjudicarían.   Chardón declaró que había aconsejado a Almodóvar en tal sentido.

Si la versión de Almodóvar es exacta, es necesario concluir que el acto realizado por Tormes reviste caracteres de un delito de falsa representación.   Si Almodóvar se desprendió de su dinero y lo entregó a Tormes, fué porque creyó a éste cuando le dijo que tenía fondos suficientes en su banco, y esa manifestación de Tormes fué hecha por él a sabiendas de su falsedad y con el propósito de obtener el dinero.

Si la versión de Tormes es exacta, tampoco puede llegarse a la conclusión de que se trataba de una verdadera operación de préstamo.   Analizando lo declarado por el propio Tormes, si bien habría que eliminar su dicho de que actualmente tenía fondos en el banco, siempre quedaría en pie su manifestación de que tendría fondos a los dos o tres días y esto no resultó y tiene todos los visos de una falsa representación. La prueba presentada por el querellado a los efectos de demostrar que estaba pendiente de recibir una fuerte suma de dinero, no tiene, a nuestro juicio, el alcance que le atribuyó el querellado, y la de que el cheque sería honrado por el banco no obstante no tener fondos en él, es muy dudosa.

Quizás Tormes no tuvo la intención plena de defraudar definitivamente a Almodóvar.   Pero la prueba inevitablemente lo presenta como aquel que necesitando una suma de dinero, es capaz de emplear y en efecto emplea para obtenerla cualquier falsa o engañosa actitud.   El testigo Almodóvar mereció entero crédito a la corte.

2. Examinemos el segundo cargo.   Se imputa, como sigue:

"Que allá por el año 1919 falleció Juan Laboy a consecuencia de un accidente del trabajo, y su viuda, Juana de Jesús, por conducto de su abogado Leopoldo Tormes García elevó la correspondiente reclamación a la Comisión de Indemnizaciones a Obreros, y, previos los trámites legales, le fué concedida una indemnización de tres mil, cuatro dollars con noventa y cuatro centavos ($3,004.94), cuya suma fué depositada en la Secretaría del Tribunal de Distrito

de Ponce, y de la misma mil trescientos catorce dollars ($1,314.00), fueron entregados a la viuda de los menores hijos de Juan Laboy y setecientos cincuenta y uno con veintiocho centavos ($751.28), al abogado Leopoldo Tormes García en pago de sus honorarios.

"Que posteriormente, en 25 de agosto de 1921, el abogado Leopoldo Tormes García, a nombre y representación de su cliente Juana de Jesús, esposa de Juan Laboy, presentó una moción a la Corte de Distrito de Ponce solicitando que el remanente de novecientos treinta y nueve dollars con setenta y un centavos ($939.71), depositados con el Secretario de la Corte de Distrito de Ponce y pertenecientes a los menores hijos de Juan Laboy le fuese entregado para adquirir con dicha suma un pedazo de terreno y casa en el barrio 'Real', de Ponce, que le ofrecía en venta Agustín Negrón por el precio de novecientos dollars ($900.00), alegando además que dicho negocio era ventajoso y de utilidad para los menores, que podrían adquirir un hogar propio y medios de obtener alguna renta con el producto de la finca.

"Que a virtud de haberse resuelto favorablemente dicha moción el día 9 de septiembre de 1921 el Secretario del Tribunal de Distrito de Ponce expidió a la orden de Juana de Jesús un cheque No. 302, a cargo del 'Crédito y Ahorro Ponceño' por la cantidad de novecientos treinta y cuatro dollars ($934.00), cuyo cheque fué entregado al abogado Leopoldo Tormes; y éste, a espaldas de dicha Juana de Jesús y sin conocimiento por parte de ésta y sin que ella firmase, endosase ni hiciese marca alguna en el cheque de referencia, cobró el mismo en el 'Crédito y Ahorro Ponceño, por medio de su agente Eladio Ayala Moura, haciendo previamente una cruz al dorso de dicho cheque y poniendo debajo el nombre de Juana de Jesús; y el citado banco 'Crédito y Ahorro Ponceño' pagó el cheque al referido Eladio Ayala Moura en efectivo, en cuarenta y seis billetes de a veinte dollars, uno de diez dollars y cuatro de un dollar.

"Que el citado querellado, Leopoldo Tormes García, una vez recibida la cantidad de novecientos treinta y cuatro dollars ($934.00), se apropió de la misma y la dedicó a fines distintos de aquéllos para los cuales le fué entregada, destinándola a la cancelación de parte del precio de una hipoteca en la cual don Angel Lomo, vecino de Ponce, era acreedor, siendo deudor don Antonio Franceschini Rodríguez, y en cuya operación no tenía participación alguna la citada Juana de Jesús ni sus hijos.

"Que todo esto lo hizo el querellado Leopoldo Tormes García sin autorización ni conocimiento de la citada Juana de Jesús y con la

intención de defraudar a los menores hijos de ésta en la referida suma de novecientos treinta y cuatro dollars ($934.00)."

Contestó el querellado así: Aceptó los dos primeros párrafos del cargo y continuó:

"Negando el resto de cuanto se deja alegado en dicho hecho, y alegando en contrario; que el *check* de $934.00 expedido por el Secretario de la Corte de Distrito de Ponce, en 9 de septiembre de 1921, le fué entregado por dicho secretario al querellado en las horas de la mañana de dicho día, no para ser entregado a Juana de Jesús, si que para comprar un terreno y casa conforme lo expresa la orden de la Corte de Distrito de Ponce, de fecha 9 de septiembre de 1921. Que fué cierto que el querellado endosó dicho *check* y lo envió al Crédito y Ahorro Ponceño, para su cambio por billetes grandes, con Eladio Ayala Moura, quien cumplió el cometido, habiendo además el querellado firmado dicho *check,* con su nombre, debajo del de Juana de Jesús, alegando además él mismo, con el fin de poder atender y terminar el negocio sobre compraventa de la finca y casa antes mencionada y que había de traspasar a sus hijos Juan y Paula Laboy, don Augstín Negrón, quien tenía que pagar al querellado el importe de $900 de dicho *check,* y entregar a Juana de Jesús sólo los $34, que sobraban, previo descuentos de los gastos de inscripción del título que adquiría; que el querellado en virtud de autorización expresa y de acuerdo con la agencia o encargo de Juana de Jesús, así como para dar cumplimiento a lo que la orden de la corte dispuso y que motivó se expidiera dicho *check,* el cual lo mismo que fué extendido a favor y orden de Juana de Jesús, pudo ser extendido a favor y orden del querellado, por haberlo así dispuesto la Corte de Distrito de Ponce, en orden de fecha 9 de septiembre de 1921, unida al record No. 9948 sobre autorización judicial y promovida por Juana de Jesús. Habiéndose extendido dicho *check* por el Secretario del Tribunal de Distrito de Ponce, a nombre de Juana de Jesús, por elección que así hizo el querellado al ser preguntado por el secretario de dicho tribunal, sobre si quería dicho *check* a su nombre o en el de Juana de Jesús.

"Que en la noche del día 9 al 10 de septiembre de 1921 una especie de ciclón o mal tiempo azotó esta Isla, y especialmente esta región sur, habiendo hecho los ríos grandes avenidas y destruyendo fincas y caminos. Que el querellado esperaba a Juana de Jesús el 9 de septiembre de 1921, que bajara desde su residencia en el barrio

Anón término municipal de Ponce, que dista más de doce kilómetros de la ciudad, habiendo necesidad de cruzar más de siete pasos de río (sin puentes ni calzadas) para llegar hasta la ciudad, por caminos malos.    Que dicha Juana de Jesús no vino a la ciudad en dicho día, que era viernes, ni tampoco sábado 10, domingo 11, ni lunes 12 de septiembre de 1921.

"Que el lunes 12 de septiembre de 1921, el querellado, en su condición de abogado tenía que comparecer a las dos de la tarde de dicho día ante la Corte Federal, de la cual era Juez o comenzaba a actuar por aquella fecha interinamente, el Hon. Emilio del Toro Cuevas, Juez de esta corte; que al efecto y queriendo este abogado cumplir con la orden de la corte, y facilitar dicha operación de Juana de Jesús y Agustín Negrón, el sabado 10 de septiembre de 1921, ya cerca de las once de la mañana y antes de que cerraran la caja del banco Crédito y Ahorro Ponceño, mandó a cambiar dicho *check*, por billetes grandes como se dejó antes alegado; que todavía el domingo 11 de septiembre de 1921, continuaba el viento y la lluvia, y en estas circunstancias, y por razón de que el lunes 12, éste querellado tenía que estar en San Juan, y el mártes 13 en Guayama atendiendo una primera comparecencia en el pleito civil sobre desahucio No.——— seguido por Rosa Alvarez y otros v. Angel Cividanes, dejaba como dejó sus asuntos encomendados a la Lcda. doña Herminia Tormes, a quien este querellado hizo entrega el domingo 11 de septiembre de 1921, la suma de novecientos treinta y cuatro dollars, montante del *check* en cuestión, para que atendiera el negocio de doña Juana de Jesús, con Agustín Negrón, sobre compraventa y ninguno de los cuales sabían firmar, y siendo ambas personas poco relacionadas en la ciudad, y a quienes de otra manera hubieran tenido grandes inconvenientes para cambiar dicho documento de valor."

Hemos examinado cuidadosamente la larga prueba practicada con respecto a este cargo, y a nuestro juicio es evidente que el querellado necesitando dinero para salvar una situación que no podía prolongarse más, cobró sin autorización de Juana de Jesús, simulando su marca, el cheque de que se trata y que había recibido para emplearlo en beneficio de los menores hijos de Juana, y una vez cobrado lo empleó en su propio beneficio, para solucionar la situación a que nos hemos referido, a saber: Angel Lomo prestó a Antonio Fran-

ceschini la suma de mil dólares que el deudor garantizó con hipoteca. Vencido el plazo fijado para pagar sin que la obligación se cumpliera, el acreedor inició un procedimiento judicial para el cobro. Así las cosas, Franceschini acudió a Tormes y ambos se dirigieron a la casa de Lomo para pagar la deuda, en uno de los días de enero de 1921. Lomo no estaba allí. Se retiraron sin verificar el pago, dejando Franceschini en poder de Tormes el dinero, volviendo a su residencia de Guayanilla. Pasaron los meses y Tormes no pagó. Otra vez recurrió el acreedor a la vía judicial y finalmente la deuda fué satisfecha el 10 de septiembre de 1921, a las siete de la tarde, empleándose en el pago los novecientos dólares que Tormes obtuvo al hacer efectivo el cheque que había recibido para los menores hijos de Juana de Jesús.

En relación especialmente con este cargo se hicieron extraordinarios esfuerzos para demostrar que el querellado era una víctima del fiscal del distrito. La corte permitió que la evidencia se practicara sin trabas técnicas de ninguna especie. Tenía ante sí el problema de aquilatar la conducta de uno de sus funcionarios y quería saber la verdad, toda la verdad en el caso. El joven fiscal del distrito fué atacado hábil, ruda e insistentemente, y si bien se logró poner de manifiesto procedimientos suyos que no merecen nuestra aprobación como el método empleado para hacer comparecer ante sí a la testigo Juana de Jesús, de todo el ataque surge su figura como la de un funcionario íntegro y valeroso que se enfrenta con toda clase de dificultades y sabe llegar hasta el fin de la jornada. Este proceso demuestra cuán difícil es perseguir al poderoso, al influyente, al hombre de inteligencia viva e ilustrada. Es debido a esas dificultades que subsisten tantas injusticias en la sociedad. Y es alentador cuando en la sociedad se encuentran hombres de carácter firme, espíritus justicieros, que en el cumplimiento de su deber no temen los riesgos personales que puedan sobrevenirle.

3. El tercer cargo se refiere al hecho de haber el quere-

llado influído en uno de los empleados de este tribunal para conocer la probable sentencia de la corte en determinada apelación antes de pronunciarse.

Una vez que un asunto queda definitivamente sometido, por regla general el juez ponente lo estudia y prepara un memorándum que somete a sus colegas. El memorándum se lee, se discute, se enmienda, se desecha o se aprueba, según sea el caso. Mientras la sentencia no se firma, como es natural, todo el proceso de estudio y discusión es secreto. Los jueces en su trabajo necesitan el auxilio material del taquígrafo y escribiente a máquina, funcionario que debe guardar también el más estricto secreto. Esto es perfectamente conocido de todos.

En el presente caso se demostró que Tormes bien por medio de carta, ya a virtud de una conversación tenida en Ponce con un taquígrafo de esta corte, se enteró de un proyecto de opinión entregado a dicho taquígrafo para ser puesto en limpio por el Juez Asociado del Toro. Tormes era amigo íntimo del empleado, sostenía correspondencia con él, y aunque el empleado, que ya había dejado de serlo cuando declaró, trató de llevar al tribunal el convencimiento de que fué él voluntariamente el que faltando a su deber dió la noticia a Tormes, el tribunal cree que el empleado cedió a las insinuaciones de Tormes. Pero aunque así no fuera, siempre resultaría probado que Tormes, que como abogado es un funcionario de la corte, aceptó la información, y no la reportó a la corte, sino que usó de ella para sus fines particulares.

4. Procederemos al estudio de varias cuestiones que como "defensas" se suscitan en la contestación.

(a) El hecho de que el querellado fuera acusado por el fiscal ante el Gran Jurado y que en lo que se refiere al primer cargo el propio fiscal solicitara el sobreseimiento y en lo que se refiere al segundo el jurado se negara a acusar, no impide que los mismos hechos sean investigados por esta corte para juzgar la conducta del abogado en este procedimiento.

Véase la opinión del tribunal en este mismo caso emitida el 24 de marzo último, (pág. 267).

(b) La intención fraudulenta del querellado surge de los hechos que se le imputaron en el segundo cargo y de la prueba. Pero aunque así no fuera, los hechos alegados y probados en relación con dicho segundo cargo demuestran una conducta inmoral por parte del querellado en relación con el ejercicio de su profesión. El querellado era el abogado de los menores. Sin penetrar en lo que sucediera con el primer dinero recibido y limitándonos al último, resulta que habiendo tenido la oportunidad de que el cheque se expidiera a su nombre, hizo, según su propia declaración, que lo fuera a nombre de Juana de Jesús. Así expedido, sin autorización para ello, trazó o hizo trazar una cruz como la marca puesta por Juana de Jesús—hecho falso—y cobró el cheque que aparecía entonces como cobrado por la propia Juana. Y así las cosas, usó de ese dinero en su propio beneficio. El hecho de que el dinero se devolviera luego, no influye. Fué devuelto después de la intervención del fiscal.

(c) Invocó el querellado el tiempo que lleva ejerciendo y el crédito que goza como abogado. Muchos declararon, en efecto, en su favor. Se trata de un joven cartero que a virtud de un esfuerzo digno y perseverante y en medio de la simpatía de toda una sociedad, estudió y se hizo abogado. Todo ello ha servido para hacer este caso más difícil y complicado. Es doloroso ver caer al que con tanto trabajo subió. La tendencia natural es impedir la caída. Pero examinados fríamente los hechos concretos investigados, nos hemos visto obligados a llegar a las conclusiones que dejamos establecidas. Quizás esta actitud sea más saludable que la de una benévola consideración, para el mismo querellado, en su futuro destino. No basta subir. Es necesario sostenerse a la altura moral de la cumbre que se escala.

Las otras "defensas" han quedado implícitamente resueltas por cuanto llevamos dicho.

5. Apreciando en conjunto las alegaciones y las pruebas, opinamos que hay base suficiente por lo menos para suspender al querellado en el ejercicio de su profesión.   Y habidas en consideración todas las circunstancias concurrentes, el término de suspensión se fijará en dos años.

> *Suspendido por dos años como abogado y notario.*

Jueces concurrentes: Sres. Asociados Wolf, Aldrey, Hutchison y Franco Soto.